LISA A. RASMUSSEN, ESQ..
Nevada Bar No. 007491
**The Law Offices of Kristina Wildeveld & Associates**
550 E. Charleston Blvd., Suite A
Las Vegas, NV 89104
Phone (702) 222-0007
Email: Lisa@veldlaw.com
Attorneys for Sylviane Whitmore

DANIEL J. HILL, ESQ.
Nevada Bar No. 12773
**Hill Law Firm**
228 S. Fourth Street, 3rd Floor
Las Vegas, NV 89101
(702) 848-6000
Email: Dan@hillfirmlawyers.com
Attorneys for Larry McDaniel

THE LAW OFFICE OF KRISTINA WILDEVELD & ASSOCIATES
550 E. CHARLESTON BLVD.
LAS VEGAS, NEVADA 89104
PH: (702) 222-0007

## UNITED STATES DISTRICT COURT

## CLARK COUNTY, NEVADA

| | | |
|---|---|---|
| THE UNITED STATES OF AMERICA, | ) | CASE NO.   2:17-cr-110-APG-DJA |
| Plaintiff, | ) ) ) | **JOINT MOTION FOR NEW TRIAL BASED UPON NEWLY DISCOVERED EVIDENCE; and SUPPLEMENTS TO PREVIOUSLY SUBMITTED MOTION FOR NEW TRIAL/JOINDER** |
| vs. | ) ) ) | |
| SYLVIANE WHITMORE, LARRY MCDANIEL, | ) ) ) | |
| Defendants. | ) ) | |

COME NOW, the Defendants, SYLVIANE WHITMORE, by and through her counsel,

Lisa A. Rasmussen, Esq. and Defendant LARRY MCDANIEL, by and through his counsel,

Daniel Hill, and hereby submit their Joint Motion for New Trial Based Upon Newly Discovered

Evidence as well as their individual Supplement(s) to the previously filed Motion for New Trial

(McDaniel) and respective Joinder (Whitmore).   This Motion is made and based upon the

attached Memorandum of Points and Authorities, the papers and pleadings on file in this case

and the attached Exhibits and Declarations.  A hearing is requested if the Court believes a

hearing would further assist in ruling upon this Motion.

Dated: April 15, 2022

**The Law Offices of Kristina Wildeveld & Associates**

/s/ Lisa A. Rasmussen

LISA A. RASMUSSEN, ESQ.
Nevada Bar No. 7491
Attorneys for Sylviane Whitmore

**Hill Law Firm**

/s/ Daniel J. Hill

DANIEL J. HILL, ESQ.
Nevada Bar No. 12773
Attorneys for Larry McDaniel

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    Introduction

Defendants Sylviane Whitmore (Ms. Whitmore) and Larry McDaniel (Mr. McDaniel) were indicted, along with Phillip Hurbace, on June 27, 2017.[1][2]  (ECF 36.) This matter proceeded to trial in June 2021 with the jury returning guilty verdicts against all three defendants on most counts, save some not submitted to the jury.  (ECF 225-227.)  Thereafter, Mr. McDaniel filed a motion for new trial and Ms. Whitmore joined  the Motion.  (ECF 230,231.)

On September 8, 2021, the court openly filed a letter it had received that was signed

[1] This is a Superseding Indictment, and it is not known when the initial indictment was filed because it is sealed.
[2] Sylviane Whitmore was a government witness in United States v. Wetselaar and Litwin, case number 2:11-cr-347 KJD.  The Wetselaar trial concluded on March 23, 2017 and it appears that the government waited until after the conclusion of that trial to apprise either defendant of the Indictment.  The fact of Ms. Whitmore's indictment by the Nevada US Attorney's Office was not disclosed to Wetselaar and/or Litwin until December 2017 and the disclosure was made orally at a forfeiture proceeding for Mr. Litwin.

THE LAW OFFICE OF KRISTINA WILDEVELD & ASSOCIATES
550 E. CHARLESTON BLVD.
LAS VEGAS, NEVADA 89104
PH: (702) 222-0007

THE LAW OFFICE OF KRISTINA WILDEVELD & ASSOCIATES
550 E. CHARLESTON BLVD.
LAS VEGAS, NEVADA 89104
PH: (702) 222-0007

"Toda Raba."  (See ECF 239 and <u>Exhibit 1</u>, attached hereto.) The letter is anonymous as "Toda Raba" is a Hebrew phrase meaning "thank you very much."  (See <u>Exhibit 2</u>.)  The cover letter portion that is signed Toda Raba is typewritten and it states that the author is elderly, is not able to travel, but believes he/she is doing what is morally right after having seen news coverage of the trial and the convictions.[3]   Attached to the anonymous typewritten letter is a hand printed confession of Elliot Shaikin, the former owner of 24/7 Private Vaults, confessing to both the 2012 robbery and the 2014 burglary with which both Mr. McDaniel and Ms. Whitmore are charged.  Not only does the Shaikin's confession implicate him, it also implicates Hurbace as having participated in both events with him (Shaikin).  It exonerates Mr. McDaniel and Ms. Whitmore from both incidents and states that Hurbace wanted to blame the employees.  This confession forms the basis for this Motion for New Trial, and it will be discussed in much greater detail below, and it will be corroborated by other newly discovered evidence.  It will also be discussed in the context of other evidence that while not newly discovered, was not known to this Court because prior counsel and these defendants lacked the confession of Elliot Shaikin prior to their trial.

At a hearing on October 5, 2021, this Court determined that it would grant a new trial for both Ms. Whitmore and Mr. McDaniel on Count 8 and that it would entertain further briefing on whether Count 9 (against Mr. McDaniel) was implicated in that ruling as are his other counts of conviction and whether a new trial on Ms. Whitmore's other counts should also be given a new trial based on this Court's ruling on Count 8.  These defendants are of the opinion that the newly discovered evidence warrants a new trial on all counts of conviction for reasons that will be explained herein, but they have nonetheless also addressed the issues the court where the court was interested in seeing additional briefing.

---

[3] There was news coverage of the verdicts in the Las Vegas Review Journal.  See <u>Insiders convicted of stealing more than $1M from vault | Las Vegas Review-Journal (reviewjournal.com)</u>  There was also coverage of the Indictments and the business in general leading up to the trial.  See: <u>Las Vegas crime: Vault robbery left customers missing millions | Las Vegas Review-Journal (reviewjournal.com)</u>; <u>Jury to decide whether break-ins at Las Vegas vault were inside jobs | Las Vegas Review-Journal (reviewjournal.com)</u>; .

THE LAW OFFICE OF KRISTINA WILDEVELD & ASSOCIATES
550 E. CHARLESTON BLVD.
LAS VEGAS, NEVADA 89104
PH: (702) 222-0007

## II.     The Standard for Granting a Motion for New Trial

Ms. Whitmore and Mr. McDaniel are entitled to a new trial pursuant to Federal Rules of Criminal Procedure Rule 33, which permits the Court to grant a new trial based on newly discovered evidence.  To obtain a new trial based on newly-discovered evidence, a defendant must show that (1) the evidence is newly discovered and was unknown to him at the time of the trial; (2) the evidence is material, not merely cumulative or impeaching; (3) the evidence will probably result in an acquittal; and (4) the failure to learn of the evidence sooner was not the result of a lack of diligence. *See* United States v. Davis, 960 F.2d 820, 824-25 (9th Cir. 1992) (quoting United States v. Walgreen, 885 F.2d 1417, 1428 (9th Cir. 1989)).

## III.     The Toda Raba Letter

### 1.   The Cover Letter

The letter is written on July 30, 2021, but is not mailed until September 2, 2021, per its postmark.  This is either indicative of someone who waited to be sure they were doing the right thing before mailing it, someone who did not have easy access to mail, or someone who possibly gave it to someone else to mail from a certain location.  It is post-marked Las Vegas, Nevada, but the content of the letter also states, "I do not wish to be involved more please," "I am elderly and not with good health," and "I cannot travel."  Exhibit 1, page 1.

It is clear from the letter that the person was aware of the outcome of the trial because it states, "Upon reading of the court proceedings in the private vault company crimes I feel it necessary and appropriate to make public now information I have regarding such events."  Id. The author goes on to state that she/he has possessed these documents since 2014 when Shaikin entrusted them to him/her in the final days before his death, but that he/she felt that it was nobody's business until now.  Id.

The author states that he/she knew Elliot and his wife Ella well, that he tried hard and that he would not admit failure.  Id.  It also implores those to whom it was sent, which appear to be not only the court, but also the government, but to "others with knowledge," to do the right thing and to make the story right.  Id.  The author also included other documents to corroborate

that he/she actually knew Shaikin and included corroborating documentation of that.  That corroboration is discussed below in subsection (3) of this section.  Id.

2.  The Confession

The confession of Shaikin states the following on the first page:

"On my death bed I confess I robbed the vaults with Phil Hurbace in 2012 & 2014 because I lost too much money there.  The Customers were scum!  Elliot Shaikin."

"What can they do to me now?"

Id. at page 3.

On the second page, it states:

"Phil wants to call crime tip line & blame employees. They were not involved.  Police are stupid!    Elliot."

Id. at page 4.

On a third portion below this second statement the confession states:

"Before I die – I hid $ from 2012 in L units, we broke in to bankrupt business to get $ out[.]  Fuck 24/7 and Shapiro."

Id.

Shaikin clearly states that he and Hurbace were responsible for both the 2012 incident as well as the 2014 "break in" and that he had money from the 2012 robbery that he hid in the L vaults and that he needed to break into the "bankrupt business" to get the "$ out."  This is completely consistent with all of the evidence, which will be discussed further below in section V.  Id. at 3,4. Further, Shaikin states that the employees were not involved, and he completely exculpates any employee except Hurbace.  Id.  Shaikin died in September of 2014, long before the FBI began its investigation in January 2015 and long before the Indictments were known to these defendants or anyone other than the U.S. Attorney's Office for the District of Nevada (July 2017.)  He had no incentive to protect Whitmore or McDaniel from a prosecution that did not happen until almost three years after his death.  As he states in his confession, the "customers were scum," he "lost too much money there," and he robbed the vaults with "Phil

THE LAW OFFICE OF KRISTINA WILDEVELD & ASSOCIATES
550 E. CHARLESTON BLVD.
LAS VEGAS, NEVADA 89104
PH: (702) 222-0007

Hurbace in 2012 & 2014."  Id.  He adds that the "Police are stupid," and "Fuck 24/7 and Shapiro."  Id.  He makes certain to state that the employees were not involved. Id.

The confession of Shaikin to both events is newly discovered and it not only inculpates Shaikin and Hurbace, it exculpates Ms. Whitmore and Mr. McDaniel.  It was not known to either defendant prior to trial and could not have been discovered prior to trial.  As is discussed below, these movants are having a difficult time locating the person who sent this letter to the Court, and the person appears to have undertaken great lengths to remain anonymous but is trying to do the right thing and probably believed that the letter would be sufficient. The confession is actually sufficient, as is discussed below in subsection (4).

3.   The Corroborating Documents Sent to the Court

The author of the Toda Raba letter sent other documents to inform the Court that he/she knew Shaikin well and had access to other documents belonging to Shaikin as a means of corroborating that he/she was close to Shaikin and that Shaikin would have entrusted this person with his confession.  Included in the package sent to the court is a photograph of Elliot Shaikin and his wife Ella Burns. Id., at page 3.  This is indeed a photo of Elliot Shaikin as can be seen from the photograph in the Las Vegas Review Journal, second link in footnote 3, *supra*, where the caption comments on his signature "suspenders," also seen in the photograph attached to the Toda Raba letter.

Also included in the Toda Raba letter are an invoice from local Channel 8 for advertising dated December 31, 2013 and an undated  typewritten letter describing Shaikin's company's 50-year ground lease that is signed by him.  Id., at pages 5 and 6.
The advertising invoice provides some additional handwritten notes purportedly from Shaikin and the ground lease letter provides a signature purportedly of Shaikin.  Presumably the author of the Toda Raba letter sent these documents to corroborate his writing, his signature and that he/she has business records belonging to Shaikin and would be a person entrusted with a dying confession.

. . .

6

THE LAW OFFICE OF KRISTINA WILDEVELD & ASSOCIATES
550 E. CHARLESTON BLVD.
LAS VEGAS, NEVADA 89104
PH: (702) 222-0007

4.   <u>The Expert Report Confirming that This is Shaikin's Handwriting</u>

The undersigned had a forensic document examination expert, Jan Seamen Kelly, examine the confession to determine whether or not the handwriting belongs to Shaikin. A copy of the handwriting expert's report is attached hereto as <u>Exhibit 2</u>.  The documents examined consist of Exhibit 1, pages 3 and 4, otherwise referred to herein as "the confession."  <u>Exhibit 2, page 1</u>.  The known documents provided to the Ms. Seamen Kelly were sourced as follows:

Item 3  Received by Lisa Rasmussen from Shawn Perez, Shaikin's civil attorney.

Item 4  Received by Lisa Rasmussen from Shawn Perez, Shaikin's civil attorney.

Item 5  ECF 239, the anonymous Toda Raba letter.

Item 6  Received by Lisa Rasmussen from Shawn Perez, Shaikin's civil attorney.

Item 7  Received by Lisa Rasmussen from Shawn Perez, Shaikin's civil attorney.

Item 8  Included in bank records produced in criminal case discovery.

Item 9  Received by Lisa Rasmussen from Shawn Perez, Shaikin's civil attorney.

Item 10 Received by Lisa Rasmussen from Shawn Perez, Shaikin's civil attorney.

Item 11 Received by Lisa Rasmussen from Shawn Perez, Shaikin's civil attorney.

Item 12 Included in bank records produced in criminal case discovery.

See <u>Declaration of Lisa Rasmussen</u>.

The conclusion of Ms. Seamen Kelly's analysis is "Elliot Shaikin is the writer of the hand printed entries on the two questioned documents listed as Items 1 and 2."  <u>Exhibit 2 at page 3</u>.  Items 1 and 2, the questioned documents, are the confession.  See attachments to <u>Exhibit 2</u>, 9th and 10th pages of the PDF.  The confession was written by Shaikin. The expert report confirming this was received by the undersigned in December 2021 and is newly discovered.

5.   <u>Efforts to Locate the Author thus Far</u>

Ms. Rasmussen has undertaken extensive efforts to locate the author of the Toda Raba letter.  See <u>Declaration of Lisa Rasmussen.</u>   This includes multiple conversations with the Bankruptcy Trustee, multiple conversations with Shawn Perez, Shaikin's former civil counsel,

attempts to speak to Kent Berkley, his bookkeeper,  hiring an investigator to interview neighbors from Shaikin's Sun City Summerlin neighborhood, asking persons of the local Jewish community if they knew Elliot Shaikin, obtaining Shaikin's cell phone records via subpoena and having the investigator isolate potential authors of the anonymous letter, sending an investigator to locate one of Shaikin's daughter to interview her in person, and going to meet with one neighbor in Sun City, along with the investigator.  Id.  As of this time, we are unable to determine who authored the anonymous letter but are still making attempts to determine who may have written the letter.  While it is not necessary to know who mailed the confession to the court, it would be helpful to know, and the undersigned are still working on additional investigation.  Id.

### IV.    The Audio Tape of Shaikin Corroborating That He Planned the April 14, 2012 Event

In November 2021, Mr. McDaniel found an audio cassette  tape in a box in his garage that he had long believed his mother had thrown out.  See Declaration of Larry McDaniel.  The audio tape a conversation between Shaikin and Mr. McDaniel that Mr. McDaniel recorded because he felt Shaikin was bullying him about working a shift he could not work.  Id.  He used his mother's cassette player/recorder to record the conversation, which he put on speaker.  Id. The undersigned had the conversation converted to digital format and "trimmed" from the cassette for better preservation and also had an audio expert reduce as much background noise as possible.  See Declaration of Lisa Rasmussen and Declaration of Walter Marin, an audio specialist.  The undersigned also asked the audio specialist to check the relevant portion for any evidence of splicing or any other irregularities that would indicate that it was not an authentic recording and Mr. Marin did not find any evidence of any such thing.  A digital copy of the trimmed audio recording is provided to the court and to counsel on a flash drive as Exhibit 3. The original audio cassette is in Mr. Marin's possession and is available for examination should the government wish to examine the original from which the trimmed, digital version was created.  Ms. Rasmussen also prepared a transcript of the conversation, which is attached hereto

as <u>Exhibit 4</u>.  It reads as follows:

First 1.5 seconds, music playing

**Elliot Shaikin:**          Totally _____ (unintelligible)

**Larry McDaniel:**       Okay Elliot, I just put you on speaker phone.  So just to clarify, you said you want me to work Karen's shift on April 14th and that's a Saturday morning, right?

**Elliot:**          The 14th at 2:00?

**Larry:**          Right.

**Elliot:**          Yes.

**Larry:**          And there is something important you need me for on the morning of the 14th?

**Elliot:**          There is.  We have a problem.  If you want the damn truth, most of our customers, well look around you, they are frightening, we have a lot of scum today that damn place is not safe.

**Larry:**          Okay.

**Elliot:**          Funny thing, you want what you need.  Think about the vaults, cash, gold, its there and I came up with which boxes to go to, 30 boxes of ugly nasty customers without proof, without recourse of any type.

**Larry:**          Elliot if I didn't know better I'd say you've been hooked up with that low life locksmith again, the one that broke in the boxes a few years ago, what's his name?

**Elliot:**          Oh yeah, Phil?

**Larry:**          Yeah, Phil.

**Elliot:**          I don't know, maybe.

**Larry:**          Oh God.  Well first of all Elliot I think you're crazy, okay.  And when it comes to cash and gold, my parents put away plenty of it over the years.  Now, I can't work that early shift because I can't leave my mother home alone and I'm not going to do something that would endanger her, so I'm

THE LAW OFFICE OF KRISTINA WILDEVELD & ASSOCIATES
550 E. CHARLESTON BLVD.
LAS VEGAS, NEVADA 89104
PH: (702) 222-0007

1          not doing this.

2  **Elliot:**      No, I don't know, that's not acceptable.

3  **Larry:**       Oh really.

4  **Elliot:**      My advice, if you don't want it, keep this private.

5  **Larry:**       Elliot, hello?  He hung up.

6  Exhibit 4.

7          The recording was made prior to April 14, 2012.  The only time that April 14th falls on a

8  Saturday is in 2012 and 2018. [4]  The next time April 14 will fall on a Saturday will be in 2019.

9  Shaikin died in September 2014, so the only time this conversation could have taken place

10 while Larry McDaniel was employed by 24/7 was prior to April 14, 2012.  Mr. McDaniel

11 recalls that the conversation was between mid-March 2012 and the very beginning of April

12 2012.  See Declaration of Larry McDaniel.   Saturday was in fact Kerin Schroeder's scheduled

13 shift, from 2 am to 10 am.  See Exhibit 24, Voluntary Statement Excerpt.

14         The voice is Elliot Shaikin because Mr. McDaniel refers to him as Elliot.  Exs. 3 and 4.

15 Furthermore, the voice matches Shaikin's voice in other known recordings such as his bench

16 trial.  See Exhibit 3, flash drive also containing known excerpts from Shaikin's bench trial.

17 The bench trial recording was provided by the government as discovery in this case.  See

18 Declaration of Lisa Rasmussen.

19         The audio recording of the conversation with Shaikin and McDaniel corroborates

20 Shaikin's confession that he and Hurbace committed and/or planned the 2012 robbery.  Shaikin

21 wanted Mr. McDaniel to work that night and Mr. McDaniel refused. He also refused to play a

22 part in what he believed was Shaikin's plan to come in with Hurbace and drill boxes.  See

23 Declaration of McDaniel.  McDaniel looked for the audio tape prior to his polygraph but was

24 not able to find it.  Id.  He believed that his mother had in fact thrown it away and that it was

25 forever lost.  He located it in November 2021.  It is newly discovered because he did not know

26 that he had it until November.  See Id., and Declaration of Lisa Rasmussen.  See also

27

28 ───────────────
[4]  Months and Years having Saturday the 14th (timeanddate.com)

THE LAW OFFICE OF KRISTINA WILDEVELD & ASSOCIATES
550 E. CHARLESTON BLVD.
LAS VEGAS, NEVADA 89104
PH: (702) 222-0007

Declaration of investigator Tom Dillard.   See also Exhibit 25, Zia Records Receipt and Exhibit 3 (flash drive), Zia Records video recording.

**V.    Various Civil Case Documents Further Corroborating Shaikin's Motive and Means to Commit Both the 2012 and 2014 Events**

There are many items of evidence that further corroborate Shaikin's confession, and his recorded statements made prior to April 14, 2012.  While these items addressed below are not newly discovered,[5] they were not presented at trial because they lacked context, meaning or corroboration absent the Toda Raba letter with Shaikin's confession and absent the audio statements.

a.   Deposition of Shaikin in December 2013 in the Burns Case

In 2012 Bradley and Lori Burns sued Shaikin and Sovereign Security Systems, Inc. over the loss of money and jewelry and other valuables from their rented box at 24/7 Private Vaults. The case was filed in the Eighth Judicial District Court, case number 12-A-673822-C.  Shaikin was deposed on December 13, 2013 by counsel for the Burns, Michael Lynch.  See Exhibit 5, Deposition Transcript.  Shaikin testified that the alarm and the cameras were "remotely disconnected."  Id., page 49.  Here are some other examples of his testimony on this topic:

Q.    So how would it be possible theoretically to disable the alarm without being inside the building?

A.    Sir, they can disable computers from a distance.

Q.    But your computer wasn't hooked up to the Internet was it?

A.    Yes.

Id, page 61.

Q.    It would have been impossible for them to break in had they not disarmed your system remotely prior to entering through the drywall?

A.    That's correct.

Id, page 62.

---

[5]  The deposition transcript from Burns v. Shaikin, 24/7 was acquired by the undersigned within the last 30 days, but it certainly could have been obtained by trial counsel had trial counsel had a reason to hunt it down.

THE LAW OFFICE OF KRISTINA WILDEVELD & ASSOCIATES
550 E. CHARLESTON BLVD.
LAS VEGAS, NEVADA 89104
PH: (702) 222-0007

TSI was the alarm company.  Shaikin testified that only he had the safe word:

Q.      Is it fair to say that the password for TSI – the safe word- was "Wolf"?

A.      Yes.

Q.      So if TSI called the store –

A.      The employee would not have it.  I had it mostly.

Id., page 65.  Shaikin knew his security system because "I put the system in."  Id., page 85.  The system was disarmed "prior to"  the robbery.  Id., page 95.

       b.   341 Meeting of Creditors Testimony

Shaikin was also questioned, under oath, by Bankruptcy Trustee Brian Shapiro. [6]  See Exhibit 6, Transcript of Meeting of Creditors pursuant to section 341.  The corporate name for 24/7 Private Vaults is Sovereign Security Systems, Inc.  Id., page 1.  Shaikin formed the company in 1999 and was its sole owner.  Id., page 10.  The company filed its bankruptcy petition on January 10, 2014.  Id., page 4.

When questioned by Michael Lynch, counsel for the Burns (creditors in the civil suit), he was asked about his profits:

Q.      I see you made considerable money over the past few years in gross receipts.  How much of that was spent in overhead?

A.      All of it.

Q.      Pardon?

A.      All of it.  Advertising, marketing, promotions, TV, radio.

Q.      So you spent all of your income on advertising and employee –

A.      And then the rent and the employees and taxes.

Q.      When is the last –

A.      So –

Q.      When is the last time you made a profit, Sovereign Security?

---

[6]  This transcript was produced in the criminal case, bates numbers 1174-1228.  The actual transcript page numbers are referenced herein.  The transcript does not have a date, but it is after the 2014 break in was discovered on February 4, 2014 and before the hearing was continued to February 24, 2014.  See page 53 of Transcript, Exhibit 6.

THE LAW OFFICE OF KRISTINA WILDEVELD & ASSOCIATES
550 E. CHARLESTON BLVD.
LAS VEGAS, NEVADA 89104
PH: (702) 222-0007

A.     I didn't make one.

Q.     You've never made a profit?

A.     No.  It was coming up.  It just fell apart at the last time.

Q.     Have haven't made a profit in 11 years?

A.     I didn't make anything because I was building up a new type of business and nobody believed it could exist.

Q.     When is the last time any money from Sovereign Security accounts either in cash or in an account was paid over to your personally?

A.     Never received anything.

Q.     Never received a dime?

A.     Not from there.  No.

Q.     You didn't take any salary or any benefits at all from the company?

A.     No, I did not.

Q.     Why did you do it for 11 years if you weren't getting a penny out of it?

A.     You got – when you're an entrepreneur, you have a crazy idea, and it stays with you, and it pushes you.

Id., pages 43, 44.   Shaikin also listed himself as a creditor in his bankruptcy schedules claiming he had advanced $2.3 million to the business which was owed to him because it was business loans.  Id., page 32.

Shaikin had motive to rob and burglarize the business.  He also had the means.  As he said in the 2012 conversation with Mr. McDaniel, "I came up with which boxes to go to, 30 boxes of ugly nasty customers without proof, without recourse of any type."  Exhibit 4.

        c.   Civil Forfeiture Proceedings

The government submitted a complaint for in rem civil forfeiture, under seal, to the court in 2016.  Within that complaint, it reiterated, verbatim, a crime stoppers tip received in January 2015, three months after Elliot Shaikin died, implicating Mr. McDaniel and Ms. Whitmore in the instant offense. See Exhibit 27.  Of course, the crime stopper tip says nothing

THE LAW OFFICE OF KRISTINA WILDEVELD & ASSOCIATES
550 E. CHARLESTON BLVD.
LAS VEGAS, NEVADA 89104
PH: (702) 222-0007

about Mr. Hurbace. Shaikin's confession predicted exactly this "anonymous" tip. See Exhibit 1.

d.   Bankruptcy Trustee Trial Testimony

At trial, Bankruptcy Trustee Shapiro testified that Shaikin was quite upset when he took over the business. ECF 216, Trial Transcript, Day 2, page 61. He testified that after being appointed trustee, he became aware that Elliott Shaikin was still operating the business, including taking on new customers. Id. at 61. Shapiro had to visit the site and shut the business down, forcing Shaikin out. Id. Shaikin was "not happy" about being forced out. Id. at 71. Shaikin did not appear to know that he was going to lose control of the business and therefore, access to the vaults and their contents. See Declaration of Lisa Rasmussen. When asked by Mr. Shapiro what he took out of the business the day he left, or what was inside the bags he carried out, he said "personal things and lunch from his wife." Exhibit 5, page 47. He was not expected to be removed from the business. The day he was removed was approximately January 31, 2014. See Declaration of Lisa Rasmussen. Mr. Shapiro discovered the burglary on February 4, 2014. ECF 216, Trial testimony, Day 2, at page 66.

The person with motive to carry out the Burglary in 2014 was Shaikin. He was angry and felt that he was owed $2.3 million. As he said in the confession, "Fuck 24/7 and Shapiro." Exhibit 1. As the anonymous author wrote, "Elliot was a good man who tried hard. For him there was no failure. He would not accept it." Id. Even the government has conceded that it is possible the owner was involved. See Motion in Limine hearing transcript, January 9, 2020, page 21. Shaikin admits he and Hurbace were responsible for the 2014 break in to "get the money" out of the "bankrupt business." Exhibit 1. These civil pleadings just further corroborate his motive and his ability to do it. Like he said, he set up the security, the alarm and cameras could be disarmed from remote.

e.   The Confession is Reliable and Admissible

The Toda Raba letter and Shaikin's statement are admissible and present no hearsay obstacles. Shaikin's dying declaration present a well-settled hearsay exception. Mattox v.

THE LAW OFFICE OF KRISTINA WILDEVELD & ASSOCIATES
550 E. CHARLESTON BLVD.
LAS VEGAS, NEVADA 89104
PH: (702) 222-0007

United States, 156 U.S. 237, 243-44 (1895). His statement was unequivocally made "without hope or recovery and in the shadow of impending death." Shepard v. United States, 290 U.S. 96, 99-100 (1933) (citations omitted).

Moreover, both the Toda Raba letter and Shaikin's dying declaration bear strong indicia of reliability. Both statements facially indicate that they were made voluntarily, and bear no indication of coercion or undue influence. See Exhibit 1; see also United States v. Layton, 855 F.2d 1388, 1405 (9th Cir. 1988) (citing Barker v. Morris, 761 F.2d 1396, 1401 (9th Cir. 1985), cert. denied, 474 U.S. 1063, (1986) and Steele v. Taylor, 684 F.2d 1193, 1204 (6th Cir. 1982), cert. denied, 460 U.S. 1053 (1983)).

Both the letter and Shaikin's dying declaration are corroborated. Id. (citing Barker at 1402, United States v. Nick, 604 F.2d 1199, 1204 (9th Cir. 1979) (per curiam), and United States v. West, 574 F.2d 1131, 1135 (4th Cir. 1978)). The author of the anonymous letter included evidence to prove he/she actually knew Shaikin, including a photograph of Elliot Shaikin and his wife Ella Burns. See Exhibit 1 at page 3; see also n.3 herein and accompanying Las Vegas Review Journal article with comments to clearly relating to the photograph. The contents of the letter make it clear the author was aware of the outcome of the trial, and was offering Shaikin's declaration to address it.

Shaikin's dying declaration is also highly corroborated. In it, he state's "Phil [Hurbace] wants to call crime tip line & blame employees. They were not involved. Police are stupid! Elliot." This falls directly in line with the January 26, 2015 report to Crime Stoppers referenced in Exhibit 20. It is clear that Hurbace followed through on this idea and did exactly what he told Shaikin he said he would do, and called Crime Stoppers to falsely implicate McDaniel and Whitmore. Id. Shaikin's declaration is further supported by the Crime Stoppers report attached as Exhibit 21. In this report, the anonymous tipster directly names Phil Hurbace as the perpetrator of the 2012 robbery at issue herein and includes emails between the tipster and Hurbace in which Hurbace encouraged the tipster to participate in the robbery, along with includes security camera images a layout of the 24/7 Private Vaults which Hurbace attached to the email. Id.

THE LAW OFFICE OF KRISTINA WILDEVELD & ASSOCIATES
550 E. CHARLESTON BLVD.
LAS VEGAS, NEVADA 89104
PH: (702) 222-0007

Shaikin's dying declaration was made spontaneously to the anonymous author "in the final days before his death." *See* Exhibit 1; <u>see also</u> <u>Layton</u>, 855 F.2d at 1405 (citing <u>Dutton v. Evans</u>, 400 U.S. 74, 88-89, (1970) (plurality)).

## VI.   The Evidence Presented at Trial

### a.   False Evidence by McCamey / Napue

Few things are more disappointing than a law enforcement agent giving false testimony in a trial.  Unfortunately, that happened here.  FBI SA Gary McCamey testified that he investigated the 2012 robbery. *See*  ECF 217, <u>Trial Day 3</u> at 20. He testified about an interview he had with Ms. Whitmore on June 2, 2012. McCamey said during the interview, Whitmore denied any involvement in the robbery, but claimed she admitted to drilling safes and taking money in the past in 2008 or 2009. McCamey testified that Whitmore explained she returned the money after someone complained about it. <u>Id.</u> at 20-21. McCamey also claimed Whitmore participated in another set of thefts in 2010. <u>Id.</u> McCamey conceded he was not aware of any adverse action taken by 24/7 against Ms. Whitmore in relation to these events. <u>Id.</u> at 31.

McCamey did not investigate the robbery in 2012, LVMPD did with Detective Doesch being the primary detective assigned to the case.  The FBI's investigation did not open until January 2015.  McCamey was asked to conduct a polygraph of Mr. McDaniel and Ms. Whitmore and he was only asked to conduct polygraphs.  In his report, which is attached hereto as <u>Exhibit 6</u>, he wrote:

> During the pre-test interview, Cordova provided the following information:
>
>     Within the first year of working at 24/7 Private Vaults, Cordova met a locksmith named "Phil", who did occasional work at the vaults.  Phil told Cordova that he was able to drill into the vaults inside 24/7.  Phil convinced Cordova that they could steal money from the vaults without being caught.  On four different occasions when Cordova was working alone on the night shift, she let Phil into the vault area to drill vaults.  Cordova advised that Phil drilled the vaults around Thanksgiving, Christmas and New Years in approximately **2008-2009**.
> Cordova and Phil split the money that they obtained from the vaults.  Cordova advised that her half of the money amounted

THE LAW OFFICE OF KRISTINA WILDEVELD & ASSOCIATES
550 E. CHARLESTON BLVD.
LAS VEGAS, NEVADA 89104
PH: (702) 222-0007

THE LAW OFFICE OF KRISTINA WILDEVELD & ASSOCIATES
550 E. CHARLESTON BLVD.
LAS VEGAS, NEVADA 89104
PH: (702) 222-0007

1    to approximately $250,000.  Cordova believes that Phil may
     have taken more than that amount for himself.

2         Cordova and Phil were stealing money from vaults that
     were in good standing, not vaults that had been abandoned.
3    Shortly after the fourth theft, a Mormon man complained to the
     owner that he was missing approximately $250,000 from his
4    vault.  Cordova decided to tell the owner about the money that
     she and Phil had stolen.  Cordova had only spent $5,000 of the
5    money.  Cordova returned $245,000 to 24/7 Vaults and then took
     $5,000 from her savings account to reimburse the remainder of
6    the money.  The owner of 24/7 called Phil into the office and
     confronted him about the thefts.  Phil initially denied any
7    involvement in the thefts.  Phil eventually admitted his
     involvement and returned $20,000 of the stolen money.  Phil
8    said that he had given the rest of the money to charity.

9         Neither Cordova nor Phil were reported to the police for
     their involvement in the thefts.

10        . . .

11

12        Cordova denied any knowledge, planning, or participation
     in the robbery at 24/7 Vaults that occurred on April 14, 2012.

13        The following relevant questions were asked during the
     examination for Robbery Series I:

14

15   A. Did you participate with anyone in robbing the 24/7 vaults on
        April 14, 2012? (Answer: No)
16   B. Did you plan with anyone to rob the 24/7 vaults on April 14,
        2012? (Answer: No)

17        The results of this examination are located in the
     "Examination Results" 3ection at the top of this report.

18   Id.  The results are that she was not deceptive in response to the questions posed to her.  Id.  In

19   other words, she passed her polygraph examination.   But more importantly, Ms. Whitmore did

20   not say any of these things to SA McCamey.  See Declaration of Sylviane Whitmore.  She

21   actually provided information to LVMPD Detective Doesch, and even those statements were  not

22   the same statements provided here, but a portion of what she told Detective Doesch is conveyed

23   here by McCamey, although it is substantially inaccurate and completely out of context.  Id.

24   First, Ms. Whitmore did not start working at 24/7 until 2009, so there is nothing she would have

25   done at all in 2008.  Id.

26        Second, what Ms. Whitmore told Detective Doesch, approximately two or three days after

27   the 2012 robbery when he was in the 24/7 office talking to all employees, was that on December

28

31, 2009, Hurbace came in to drill vaults.  Id.  She was working that night.  Id.  She became suspicious as to what he was doing and  in response, he (Hurbace) came out and plopped a bag on the desk and told her "there is more where this came from"  which she perceived as an attempt to stop her from questioning his activities or to "buy her silence."  Id.  She did not know what to say and was actually quite perplexed by it.  Id.  She took the bag home because she felt it not safe to leave it there and she brought it back to work the next day, January 1, 2010, at 7:30 a.m., over two hours prior to her regularly scheduled 10:00 a.m. shift.  Id.  She gave the bag to Elliot Shaikin and reported what had happened the night before.  Id. They counted it, in the presence of bookkeeper Morris Golden and there was $245,000 in the bag.  Id.  Shaikin fired Hurbace and was very, very angry at Hurbace over the incident, or at least Ms. Whitmore believed he was angry.  Id.  Ms. Whitmore believed she had done the right thing.  Shaikin kept the funds she returned.  Id.

In approximately April 2010, a man came in to get money out of his box and he complained to Shaikin that he was missing $250,000 from his box.  Id.  Shaikin assumed that the money Ms. Whitmore had given him on January 1, 2010 was his, and he gave it to him. Id.  No one knew his name, but he was a Mormon man from southern Utah.  He complained when he received $245,000 and argued with Shaikin that he had $250,000.  Id.  Shaikin refused to give him $5,000. Id.  Ms. Whitmore felt bad that she had even taken the money home and brought it back or that she had touched it and she withdrew $5,000 from her savings account and brought the money to 24/7 to cover it so that the man would not accuse her of stealing.  Id.

Additionally, there were three occasions that Hurbace accessed the vaults while Ms. Whitmore was working, not four. The three were (not four as stated by McCamey): Thanksgiving, Christmas and New Year's, all in 2009.  Id.  See Exhibit 7, door access data showing the three (not four) occasions, November 26, December 18 and December 31, 2009.

This is what happened, and this is what Ms. Whitmore told Detective Doesch.  Whitmore Declaration.  She told Detective Doesch this because she thought it was important for him to know that Hurbace was drilling vaults and that he handed her $245,000 and said, "there is more where this came from."  Declaration of Sylviane Whitmore.  She did not tell anyone that she took

THE LAW OFFICE OF KRISTINA WILDEVELD & ASSOCIATES
550 E. CHARLESTON BLVD.
LAS VEGAS, NEVADA 89104
PH: (702) 222-0007

$5,000 of the money, instead, she explained that she paid $5,000 of her money because she felt bad for the man and Shaikin refused to pay him $5,000, but he did fire Hurbace. Id.  None of this was relayed to McCamey, it was all information Ms. Whitmore provided to LVMPD Detective Doesch. Id.  For whatever reason, SA McCamey wrote these statements in his report as if she had made the statements to him, when in fact, she had not. Id.  Worse, he also testified that she made the statements to him, when in fact she not only didn't make the statements attributed to her, she didn't make any of the statements inserted above to McCamey. Id.  Her conversation with McCamey was about the polygraph and was very limited to that. She did sign a Miranda waiver when she was doing the polygraph. That part is accurate. Id.  She did answer the polygraph questions. Id.

Ms. Whitmore did tell Detective Doesch about the times she could recall Hurbace being in the vault when she was there, and she identified approximately three times total. Id..  That part is correct, but she did not say that she had been receiving money from Hurbace each of those three times as McCamey states and her conversation was with Doesch, not McCamey. Id.  It is unknown why McCamey wrote this in his report and/or what narrative he obtained from Doesch. This is the problem with not recording statements.  The undersigned subpoenaed LVMPD for its entire files for the 2012 and 2014 events because the information provided by the government is incomplete.  See Declaration of Lisa Rasmussen, and Subpoena to LVMPD, attached hereto as Exhibit 8.  In the subpoena, the undersigned requested all notes taken by Doesch related to the 2012 investigation. Id.  There were no notes from Doesch provided by LVMPD. Id.  In fact, there are no references in the entire investigative report about any interviews, recorded or not, with any employee at 24/7, even though Doesch interviewed every single employee and took notes in his notebook when he interviewed Ms. Whitmore and Mr. McDaniel. Id.  He did say in his "folder note" dated May 23, 2012 that all employees are considered suspects, but none of them gave him the impression they were involved.  See Exhibit 9.

Somehow, Ms. Whitmore's unrecorded statement to Detective Doesch, telling him her prior experience with Hurbace, was transmuted into the notion that she had been drilling boxes,

when in fact she has never drilled a box, and it also morphed into something she had admitted doing in 2008 (when she did not work there) and then again in 2009 and 2010 when she "got caught" by the Mormon man.  In reality, none of this is what she said, and it is not what happened.  See Declaration of Sylviane Whitmore.  Ms. Whitmore did not give the $245,000 to Shaikin in April, she gave it to him on January 1, 2010, the very next morning after Hurbace handed it to her.  Id.  See photo of money, Exhibit 10, Bookkeeper Morris Golden's statement about receiving the $245,000 on January 1, 2010, Exhibit 11, and Sylviane Whitmore's corresponding Statement  dated January 1, 2010, Exhibit 12.  Exhibits 10 and 11 were  located on the disc attorney Todd Leventhal recovered from 24/7 vaults and were provided to Mr. Hill in January 2022.  See Declaration of Dan Hill.  The metadata on each of these photographs indicates that the were taken on January 1, 2010.   The originals are available for inspection.  Id.  A photograph of the $5,000 withdrawal Ms. Whitmore made from her money market savings account is attached hereto as Exhibit 13.  This shows that she made the withdrawal on April 13, 2010.  This check was located in the discovery provided by the government as indicated in the handwritten notations.  Id.  Finally, a statement signed by the Mormon man, stating that he received $250,000 cash on April 13, 2010 and that this is the entirety of the money or assets he had in his vault box is attached hereto as Exhibit 14.  Exhibits 12 and 14 were provided to Ms. Whitmore upon her request by Morris Golden in April 2010.  See Declaration of Sylviane Whitmore.  The metadata on the originals indicates that the images were created in April 2010 and the digital images are available for inspection.

Morris Golden, the former bookkeeper who authored the January 1, 2010 statement  is deceased, but there are numerous comparative signatures for him in the discovery provided by the government in this case.  See Exhibit 15.

In sum, Ms. Whitmore did not tell SA McCamey that she stole money with Hurbace in 2008-2009 and that she returned it when she was confronted in April.  Not only did she not tell McCamey that, she did not tell Detective Doesch that either.  Why?  Because it wasn't true. What is true is that Hurbace handed her the money on December 31, 2009 when she began

THE LAW OFFICE OF KRISTINA WILDEVELD & ASSOCIATES
550 E. CHARLESTON BLVD.
LAS VEGAS, NEVADA 89104
PH: (702) 222-0007

THE LAW OFFICE OF KRISTINA WILDEVELD & ASSOCIATES
550 E. CHARLESTON BLVD.
LAS VEGAS, NEVADA 89104
PH: (702) 222-0007

1    questioning what he was doing.  See Exhibit 12.  She returned the money to Shaikin the very

2    next day.  See Exhibits 10, 11 and 12.  When the man said he had $250,000, not $245,000,

3    Shaikin refused to give him $5,000, she did because she felt responsible for taking the money

4    out of the business until the following morning.  See  Declaration of Sylviane Whitmore and

5    Exhibits 13 and 14.

6           The government has an obligation to correct testimony it knows is wrong or inaccurate

7    or misleading.  Napue v. Illinois, 360 U.S. 264 (1959).  While these movants are not in a

8    position to argue that the government knew SA McCamey's testimony was false, the

9    government is on notice at this point.  The evidence submitted herein demonstrates that SA

10   McCamey's testimony and report are grossly inaccurate and horribly misleading. This grossly

11   misleading, if not false testimony became a narrative not only during trial, but prior to trial with

12   this Court.  Based on the short interactions the undersigned has had with the Court, there seems

13   to be an unfounded government advanced false narrative that Ms. Whitmore was "involved in

14   stealing money with Hurbace" in other incidents in 2008 and 2009.  She did not even work there

15   in 2008. These things were casually referenced as "other bad acts" but there is nothing to

16   support them other than McCamey's statement, a statement Ms. Whitmore never made to him.

17   Or to anyone, for that matter.  It should also be noted that Detective Doesch, the lead

18   investigator in the 2012 robbery, was not called as a witness by the government.  Had he been

19   called; he certainly would have been cross examined on the fact that he interviewed all

20   employees of 24/7 and that there is nothing in LVMPD's police report about any of those

21   interviews.  It is not known why the government did not call him as a witness and certainly

22   defense counsel should have.  It is also not known why there is no reference in LVMPD's

23   records to his employee interviews.

24          Ms. Whitmore volunteered the information about the December 31, 2009 incident to

25   Detective Doesch when she came to the store for her regularly scheduled day shift

26   approximately two days after the robbery.  See Declaration of Sylviane Whitmore.  She knew

27   the business had been robbed and she believed that it would be important for Detective Doesch

28

to know about the prior incident with Hurbace.  Id.  She assumed that Shaikin would have told Doesch about Hurbace and she even asked Shaikin if she should tell the detective about Hurbace.  Id.  Shaikin's response to her was "If you want to."  Id. This was an odd response from Shaikin as one would have assumed that would have been the first thing that he would have told law enforcement – about the former locksmith and "security manager" who took at least $250,000 from a vault and gave it to another employee.  Conversely, the last thing one would do if they were involved in a robbery at their place of business would be to tell a detective about the time a fellow employee handed her $245,000 after cruising the vault for the evening.

> b.   Trial testimony generally

Jo Anne Wiley from the taxation department of Nevada's DETR testified that according to state tax filings, Mr. McDaniel and Ms. Whitmore each made about $2000 a month as employees of 24/7 Private Vaults. *See* Trial Day 1 at 43. Ms. Wiley testified that based on other records, McDaniel and Whitmore made similar or smaller wages in the years proceeding their employment at 24/7. *Id.* at 44-49. Ms. Wiley conceded that the records don't report any sort of inheritance or non-wage income. *Id*. at 57.

LVMPD CSA Jeffrey Scott provided foundational testimony for the introduction of the photographs of the 2012 robbery scene. *Id*. at 59-90.

LVMPD Detective Justin Beveridge testified regarding the 2012 robbery. He testified that his role at the scene was to document the property taken and identify whose property was taken to the best of his abilities given the anonymity of the 24/7 vaults. *See* Trial Day 2 at 12. He was able to identify the owners of approximately 10 of the compromised vaults by way of personal identifying papers left in the vaults. *Id.*

Bradley Burns was a customer of 24/7 beginning in the summer of 2010. *Id.* at 26. Burns explained, generally, the security measures of accessing the vaults as a customer. *Id.* at 30. Burns testified about a lifetime's worth of jewelry he and his wife stored at 24/7. *Id.* at 32. Burns detailed a unique Roger Dubuis watch that was stored there. *Id*. at 34.  He explained that

THE LAW OFFICE OF KRISTINA WILDEVELD & ASSOCIATES
550 E. CHARLESTON BLVD.
LAS VEGAS, NEVADA 89104
PH: (702) 222-0007

sometime in 2012 he accessed his vault and discovered it was empty. *Id.* at 35. He testified that he later secured the watch's return through a detective on the case. *Id.* at 36.

Debra Beever, a banker at Plumas Bank, testified about a cash deposit she supervised in the amount of $141,636.95 by Phillip Hurbace on June 27, 2012. *Id.* at 51. Hurbace made the deposit into a title company's account. *Id.* at 53.

Brian Shapiro was the bankruptcy trustee of 24/7 when it filed for Chapter 7 bankruptcy in January of 2014. *Id.* at 59. He testified that after being appointed trustee, he became aware that Elliott Shaikin was still operating the business, including taking on new customers. *Id.* at 61. Shapiro had to visit the site and shut the business down, forcing Shaikin out. *Id.* Shaikin was "not happy" about being forced out. *Id.* at 71. A short time later, Shapiro determined the contents of the vaults was not property of the bankruptcy estate and issued press releases advising people to retrieve their property. *Id.* at 66. Shapiro discovered on February 4, 2014 that 24/7 had been burglarized through a hole in the wall. *Id.* at 66. Shapiro had not inventoried the vaults to know what, if anything, was taken during the burglary. *Id.* at 76.

LVMPD CSA Caitlin King provided foundational testimony for the introduction of the photographs of the 2014 burglary scene. *Id.* at 92-139.

Sally Solis Hernandez was a banker in 2014 who managed a $190,000 cash deposit by Ms. Whitmore on August 4, 2014. *Id.* at 142. Ms. Whitmore deposited the cash into an account in her name. *Id.* at 144. Solis Hernandez testified that Ms. Whitmore willingly provided identifying information and photo ID in the process of making the deposit. *Id.* at 145.

Michael Branham is a Chase Bank teller who assisted Mr. McDaniel and his mother Verna open checking and savings accounts on February 5, 2014. *Id.* at 148. Verna deposited $392,000 cash into the accounts. *Id.* at 149. Branham testified that McDaniel explained that the cash was found in various hiding spots throughout Verna's house after McDaniel's father died. *Id.* Branham explained it was uncommon for cash to have been reported as previously kept in mattresses, pillows, and other hiding spots throughout a house. *Id.* at 150. Verna later added McDaniel as a signer on the accounts. *Id.* at 153.

THE LAW OFFICE OF KRISTINA WILDEVELD & ASSOCIATES
550 E. CHARLESTON BLVD.
LAS VEGAS, NEVADA 89104
PH: (702) 222-0007

Christopher Beckner is a branch manager with Chase Bank. *Id.* at 169. He testified that on May 18, 2015, McDaniel opened an account in McDaniel's name at his branch with a cash deposit of $141,900. *Id.* at 172. McDaniel explained to Beckner the money was recovered from his mother's house after his mother died. *Id.* McDaniel willingly provided all necessary identifying documents in opening the account. *Id.* at 176.

Kerin Schroeder worked the night shift at 24/7 during the 2012 robbery. *Id.* at 184. On the morning of April 14, 2012, she returned from the restroom to find three men with ski masks. *Id.* at 186. After a skirmish, the men taped her to a chair in the restroom. *Id.* at 187. On her way to being bound in the restroom, she saw the robbers fussing with the alarm. *Id.* at 189. She heard the robbers communicating on radios while she was bound. *Id.* at 190. After a time when the hallway was quiet, she wheeled herself in the chair over to the phone and called the police. *Id.* at 192. It was clear the store had been ransacked. *Id.*

Francis Spotten was a night-time security guard at 24/7. *Id.* at 32. She explained the photographs taken at each incident to the jury for context of the store. *Id.* at 32-50. She testified that Hurbace worked on 24/7's security system and maintained a workshop there, where he would, in part, drill out abandoned or unpaid safes. *Id*. at 50.

Jane Spotten, Francis' wife, was also a night-time security guard for a time at 24/7. *Id.* at 65. She testified to a time she saw Hurbace access the VIP vault through the ceiling when there was a lock malfunction, and everyone was locked out. *Id.* at 67.

LVMPD Det. Gary Chaney testified about a $269,000 cash deposit made by Ms. Whitmore into a NSB account on November 21, 2012. *Id.* at 81. He explained that Whitmore wrote a $230,000 check out of that account on October 7, 2013 and deposited it into her mother's account at Chase, where Whitmore was a signer. *Id*. at 86. Chaney testified that although Whitmore's mother died in 2014, in 2015 Whitmore made two approximately $100,000 transactions out of her mother's account (on which Whitmore was a signer). *Id.* at 90. One transaction was to a title company, and the other was a cashier's check from when the account closed made out to Whitmore's mother, which Whitmore used to open another bank account. *Id.*

THE LAW OFFICE OF KRISTINA WILDEVELD & ASSOCIATES
550 E. CHARLESTON BLVD.
LAS VEGAS, NEVADA 89104
PH: (702) 222-0007

at 93-94. Chaney explained that Whitmore used some of the money from the account Solis Hernandez opened with a $190,000 cash deposit to buy a car. *Id.* at 100.

Chaney testified that McDaniel transferred around $90,000 out of the joint account he opened with his mother to an account he held alone in April of 2009. *Id.* at 112. The remainder of the money in the joint account was used to open other bank accounts in McDaniel's name alone. Those funds were used to purchase a house and a Porsche. *Id.* at 120-125.

Chaney also testified about a property Hurbace purchased with cash deposits. *Id.* at 128. He testified that on June 15, 2015, Hurbace tried to pawn the Roger Dubuis watch, which was discovered by its serial number at attempted sale. *Id.* at 131.

McDaniel called his realtor from prior to the 2014 burglary. She testified that prior to 2014, he wanted to purchase a property for cash. *See* Trial Day 5 at 25-26. She told him he needed to deposit the cash to show proof of funds. *Id.*

Whitmore called a few witnesses. Her niece Taylor testified to Whitmore's mother's lucrative cigarette business. *Id*. at 29. She testified that Whitmore took over the business and ran it for many years. *Id.* Taylor accompanied Whitmore to the casinos during business operations countless times. *Id.* at 31. She regularly saw large amounts of cash earnings that were kept in the cigarette room's safe. *Id.* She testified that Whitmore's relationship with her brother was strained. *Id.* at 34.

Laura Engel, Whitmore's mother's best friend, testified by way of deposition. She had known Whitmore's mother since childhood. *See Laura Engel Deposition* at 5. She was familiar with the mother's cigarette vendor business and was aware that it was a cash business. *Id.* at 8. She testified that at the height of the mother's cigarette business, it was customary in Las Vegas to keep earnings in cash. *Id.* at 16. Whitmore's cousin Linda also testified by deposition. Linda corroborated that Whitmore's mother's cigarette business was a lucrative cash business. *See Linda Brown Deposition* at 7. She regularly saw Whitmore's mother with large amounts of cash. *Id.* at 9.

Whitmore's ex-husband, Arturo, testified that Whitmore got almost $100,000 cash out of the house they sold. *Id.* at 43-44. He also gave Whitmore cash when they divorced. *Id.* at 54.

THE LAW OFFICE OF KRISTINA WILDEVELD & ASSOCIATES
550 E. CHARLESTON BLVD.
LAS VEGAS, NEVADA 89104
PH: (702) 222-0007

Whitmore's accountant testified about a December 2012 meeting regarding an inheritance from Whitmore's parents. He was aware of a $190,000 proposed inheritance from her mother and another $269,000 from her father. *Id.* at 59. Linda Dobash was a friend of Whitmore's mother. *Id.* at 70. She testified to having seen Whitmore's mother's safe full of high-denomination cash and jewelry between 2008 and 2010. *Id.* at 79.

The government called Whitmore's estranged brother Mark as a rebuttal witness. Mark testified that he was the executor of his father's estate. *Id.* at 101. He was not aware of any cash. *Id.* He recalled distributing the estate's assets in checks. *Id.* at 102. He conceded that his relationship with Whitmore is and has been strained. *Id.* at 104. He also agreed that Whitmore's cigarette business was lucrative. *Id.* Although he was the executor to his father's estate, he was less familiar with his mother's estate. *Id.* at 108. He testified it was possible his mother may have had significant amounts of undisclosed cash. *Id.*

## VI.   **The Evidence NOT Presented at Trial**

### a.   Evidence the Government Failed to Present at Trial

The government did not present any direct evidence of Whitmore or McDaniel's involvement in either the robbery or the burglary. Neither did the government present a coherent and full picture that circumstantially preponderates in favor of the convictions. The investigation was, at best, piecemeal. The government presented no evidence of either Whitmore or McDaniel having any contact with Hurbace after he was fired in 2010. More importantly, the government provided no direct evidence that any of the cash in question was ill-gotten. No investigator was able to determine how much cash—if any—was taken in either incident. No missing property—cash or otherwise—was inventoried save for limited personal property from the 2012 robbery that was recovered when Hurbace tried to sell it.

Instead, the government started with large cash deposits, assumed guilt, and worked backwards. Nothing traces the cash deposits in this case back to any illegal proceeds. Instead, the government assumed and argued illegality unless proven otherwise.

. . .

THE LAW OFFICE OF KRISTINA WILDEVELD & ASSOCIATES
550 E. CHARLESTON BLVD.
LAS VEGAS, NEVADA 89104
PH: (702) 222-0007

THE LAW OFFICE OF KRISTINA WILDEVELD & ASSOCIATES
550 E. CHARLESTON BLVD.
LAS VEGAS, NEVADA 89104
PH: (702) 222-0007

b.   <u>Evidence Prior Counsel for Whitmore and McDaniel Did Not Present at Trial.</u>

Mr. McDaniel has been in possession or has recently discovered documentation and photographs that irrefutably establish the legitimate source of his cash deposits at issue in this trial. Two testamentary documents from his father explain that his father's cash and gold were transferred to McDaniel's mother after his death, and to McDaniel after his mother's death. <u>Exhibit 21</u>. A 1981 receipt and subsequent newspaper article document McDaniel's mother's sale of her husband's violin for $390,000 cash in 1981. <u>Exhibit 18, 19</u>. A pair of photographs show McDaniel's mother holding a pillow, the inside of which contains $100,000 cash. <u>Exhibit 20</u>. A pair of 1989 photographs show a box in Ms. McDaniel's home, the inside of which is photographed to contain $765,000 in cash. <u>*Id.*</u> All the metadata for the digital photos or scans depict creation or scan dates years before either the 2012 or 2014 events. *See* <u>Decl. of Larry McDaniel</u>.

McDaniel preserved a contract for a personal box at 24/7 he rented from January 2006 through January 2012. <u>Exhibit 18</u>. It has his mother's name and McDaniel's initials on it. *Id.* McDaniel and his mother stored the $765,000 cash and 60 gold coins in that box. *See* <u>Declaration of Larry McDaniel</u>. Uneasy with leaving such a large amount in a private vault, McDaniel's mother obtained, through McDaniel, a written acknowledgement from Shaikin of the $765,000 and gold coins being stored at 24/7. <u>*Id.*</u> The acknowledgment was signed by Shaikin, McDaniel, and McDaniel's mother. Those scanned documents' metadata likewise reflects a scan date more than three years before the 2012 robbery and six years before the 2014 burglary. *See*  <u>Declaration of Larry McDaniel</u>.

Shortly after Mr. McDaniel closed his box at 24/7 and returned the cash and gold home, he and his mother used some of the money to purchase a property. McDaniel's U.S. Bank statement from January of 2012 (three months before the robbery and three years before the burglary) shows a $189,000 cash deposit. <u>Exhibit 22</u>.

Hurbace was given unfettered access to enter the vault any time he wanted and for any

purpose he wanted prior to January 1, 2010.  See Exhibit 16.  Defense counsel did not present this Exhibit, which was on the 24/7 disc that Mr. Leventhal obtained by visiting the store.  It was located in a box he provided to Mr. Hill in January 2022.   Similarly, Exhibit 7 shows the three times that Hurbace was present when Ms. Whitmore was working and shows that each time, Ms. Whitmore used her iris to access the vault for him, something no one would do if they were conspiring and did not want to leave a record of granting him access.  See Exhibit 7.

Exhibit 28 shows that Hurbace (P.K. Electronics) set up the security and alarm system and zones.  It also shows that the "master code" is "known only by Elliot" and that the TSI Passcode is Wolf. The passcode is for employees to give to TSI should they call and wonder if there is a break-in. The master code is how the system is disarmed and armed from remote and only Elliot had that code.  Id.  Also note that the code 65412, which appears "posted on the wall,' is a duress code, not a code to disarm the system, as represented by the government.  Id. This Exhibit was also on the 24/7 disc.

Exhibit 17 is a flyer that advertises for a "licensing opportunity" for investors and attached to that is a handwritten note by Shaikin that says "Sylviane to inherit 6 figures from father per mother- cash invest 24/7?  Very hard to find ES."  Id.  There are also some typewritten notes about other possible investors.

Exhibit 27 shows an anonymous tip to Crime Stoppers implicating Hurbace in the 2012 robbery and showing detailed notes about his (Hurbace's) plan for the event.  Perhaps this was excluded as part of a motion in limine prior to trial, but the information is quite clear that Hurbace planned this event with three others who are clearly not Ms. Whitmore or Mr. McDaniel.  This is from discovery produced by the government.  Notably, there is a "woman" listed and the government suggested at trial that when Schroeder could hear a woman's voice, which had to have been the voice of Ms. Whitmore.

A vehicle registered to Hurbace's then girlfriend, Gloria Rodney, was at the 24/7 location the morning of the April 14, 2012 robbery.  See Exhibit 30.  Neither party brought these photos into evidence, though the documents were in discovery in the criminal case.  Id.

This further corroborates Shaikin's confession.

Ms. Whitmore loaned $50,000 to Shaikin in April 2010.  See Exhibit 29.  He paid her back.  No one introduced evidence of how well she treated Shaikin and how kind she was to him.

Tax returns from Suzette Whitmore's cigarette concession business were never introduced, though they plainly showed that Suzette's business often grossed close to half a million dollars per year in declared revenue.  See Exhibit 31.

Additionally, the TSI security log for the alarm system at 24/7 around the time of the 2012 robbery was obtained from exhibits of Shaikin's civil trial. *See* Declaration of Daniel Hill.  The manual for the exact system was open-sourced. *Id.*  The two together indicate the testimony regarding the robbers' activity at the alarm keypad was mistaken or inaccurate. The registered actions in the log indicate the robbers triggered a "bypass event." See Exhibit 32. According to the manual, the system can only be "bypassed" if it was already disarmed. See Exhibit 33. Disarming the alarm would show as "opening," not "bypassed." *Id.* This means that the alarm system was already disarmed before the robbers arrived—and the log indicates it had been disarmed for some time.

While none of these items are newly discoverable, the court must take them into consideration under the totality of the circumstances when deciding whether to grant a motion for new trial. These documents are presented because the primary issue before the court is that a third party has confessed to the crimes that these two defendants are charged with and he has not only confessed, he has exculpated Ms. Whitmore and Mr. McDaniel by stating that he and Hurbace committed these acts and that they [Whitmore and McDaniel] did not.  One of the prongs the court must analyze is whether or not the newly discovered evidence would likely lead to a different result.  The entire trial would be different with Shaikin's confession.  While prior counsel did not believe they could present a defense involving Shaikin's liability (access, motive) previously, that analysis is substantially different today. The other non-newly discovered evidence provided throughout is important for the court to understand that evidence

that explains the financial transactions of the defendants does exist even if it was not previously presented and that there is substantial "other evidence" inculpating Shaikin which corroborates his confession.  All of this other non-newly discovered evidence is presented to the court for that purpose.  The confession of another for the crimes at issue here is such a substantial matter that it alters the entire approach to a trial, and it cannot be said that it would not make any difference in the outcome.

VIII.   **The Inescapable Conclusion that Shaikin and Hurbace are Responsible for Both the 2012 Robbery and the 2014 Burglary and NOT Whitmore or McDaniel**

The government told the jury that the offenses required insider knowledge and that no one had more insider knowledge than the three defendants on trial in this case.  While pushing its focus away from the one defendant who had a traceable watch in his hand and encouraging the jury to believe that Hurbace could only have committed the offense with the assistance of Ms. Whitmore, the government ignored everything else that it knew to be true: that Shaikin had even more insider knowledge than Ms. Whitmore and Mr. McDaniel and that he had the motive and the means (Hurbace) to commit both offenses.

The anonymous letter is Elliot Shaikin's confession.  The confession inculpates Shaikin and Hurbace in both events, though Hurbace was not charged with the 2014 incident, lucky for him.  The confession exculpates both Ms. Whitmore and Mr. McDaniel and even aptly predicts that Hurbace wanted to call a crime tip hotline and blame "the employees."   Evidently he did that after Shaikin died.  For all of his failing and pride, Shaikin tried to do the right thing at the last minute.  It appears he took the money he had taken out of vault and secreted away for himself "in the L vaults" via a burglary in 2014 after he realized that he had lost control of the day to day operation and hence, access to the money that used to fall his way when customers abandoned their boxes or when he staged a robbery.  This may account for the fact that no one has reported anything missing from the 2014 burglary.  Not a single stolen property report has

THE LAW OFFICE OF KRISTINA WILDEVELD & ASSOCIATES
550 E. CHARLESTON BLVD.
LAS VEGAS, NEVADA 89104
PH: (702) 222-0007

been made in the eight years that have passed and this is likely because the money Shaikin had secreted away was abandoned loot. It would be interesting to know where Shaikin took his loot. The undersigned does not have access to any of his trust documents. What we did find in the discovery, however (on the 24/7 vault discs) was a rental agreement from 2013 for U.S. Private Vaults in Beverly Hills. Shaikin knew the owner of that business and they had exchanged business ideas and business models. See <u>Declaration of Lisa Rasmussen and Sylviane Whitmore.</u>   Ironically, all of the vaults at U.S. Private Vaults were seized by the government and any unclaimed property is now in the possession of the government, forever forfeited. See <u>Exhibit 34</u>, LA Times news articles. The government probably has any property that Shaikin looted in the 2014 burglary anyway. <u>Id.</u>

Shaikin's confession is reliable and corroborated in many, many ways. It is also authenticated by a forensic document examiner. There is no doubt the outcome of a trial with these two defendants in possession of the confession  of another who claims that he, not they, committed the offense is a material matter. It simply cannot be said that it would not matter. It matters so much that it creates an entirely different defense and an entirely different approach. Although it is certainly the government's right to still proceed to trial in the face of all of this confirmation that these are in fact Shaikin's words and that it is his confession,, the government certainly has a right to pursue what it believes to be a crime, albeit at its own peril.

It is respectfully requested that this Court issue an order granting a new trial on all counts with regard to all counts of conviction for  Ms. Whitmore and Mr. McDaniel. The newly discovered evidence is exculpatory, and it cannot be said that it would not result in an acquittal.

## IX.   Analysis Of McDaniel's Count 9

The evidence preponderates against upholding the jury's verdict on counts 9 and 10 against McDaniel for two reasons. Foremost, there was insufficient evidence to establish that McDaniel knew the cash deposited for use in each wire transfer was stolen. The money was deposited with no unusual activity with his elderly mother. Documentation was presented willingly at each deposit. No evidence was presented tracing the cash to the 2014 burglary. No

THE LAW OFFICE OF KRISTINA WILDEVELD & ASSOCIATES
550 E. CHARLESTON BLVD.
LAS VEGAS, NEVADA 89104
PH: (702) 222-0007

evidence was presented, in fact, that anything was taken during the 2014 burglary.

Furthermore, the counts, which required a finding that money was stolen, and McDaniel knew it, was—at least from the government's argument—predicated on count 8. The government argued in no uncertain terms that the cash McDaniel was depositing was from count 8. The government argued that the reason McDaniel knew the money was stolen was because of count 8. The jury was presented with count 8 and made a finding on count 8. In other words, even if counts 9 and 10 aren't legally predicated on count 8, the government's presentation of evidence and argument predicated counts 9 and 10 on count 8. This Court has already found that the verdict on count 8 cannot be legally supported. Based upon the government's evidence and argument, then, counts 9 and 10 fall of their own weight.

## X.    Analysis of Whitmore's Remaining Counts

The government presented the following evidence of financial transactions against Ms. Whitmore to support its theory of the case:

- A deposit/CTR report made on 11/21/12 in the amount of $269,000.  Trial Tr. Day 3, page 81.
- A check written for $230,000 on 10/8/13.  Id., page 83.
- An outgoing wire to Ticor Title on 3/26/15 in the amount of $90,637.87.  Id., page 89.
- A withdrawal on 5/28/15 in the amount of $133,962.54.  Id at 89.
- A deposit to open an account at Wells Fargo in the amount of $133,962.54 on 6/1/15.  Id. at 94-95.
- A counter credit deposit for $190,000 on 8/4/14 (into a Trust account).  Id. at 97.
- Suzette Whitmore's death was on 6/15/14.  Id. at 90.
- A withdrawal of $49,016.94 on 4/11/15.  Id. at 99.
- A purchase from Cadillac Las Vegas West in the amount of $49,016.94.  Id. at 100.  No date specified but corresponds to the 4/11/15 withdrawal.  Id.
- The 49,016,.94 and the 133,000 withdrawals include at least some stolen funds.  Id. at 103.

In closing, the government argued that defendants were liable because they had insider knowledge that "no one else would know."  Trial Tr. Day 5, page 142.  That Hurbace and Ms. Whitmore were charged I the 2012 robbery and that Ms. Whitmore and Mr. McDaniel were charged in the 2014 burglary.  Id. at 143-144.  It argued that both Hurbace and Whitmore knew

THE LAW OFFICE OF KRISTINA WILDEVELD & ASSOCIATES
550 E. CHARLESTON BLVD.
LAS VEGAS, NEVADA 89104
PH: (702) 222-0007

THE LAW OFFICE OF KRISTINA WILDEVELD & ASSOCIATES
550 E. CHARLESTON BLVD.
LAS VEGAS, NEVADA 89104
PH: (702) 222-0007

that the ads about fortification were not true, and they had insider information about the security system and that they were easily overridden.

The government argued that Hurbace had motive because he was hurting financial having lost his retirement and because he was fired in 2010 after a heated argument with the owner, though they never said why he was in a heated argument with the owner.  Id. at 145.  They ran through a litany of Hurbace's "insider knowledge" but then opined that the one thing Hurbace lacked was "inside information on worker shifts and customer flows," suggesting that he needed Whitmore for this.  Id. age pages 145-146.

The government then argued that Whitmore had the knowledge that Hurbace needed, that she knew Schroeder's shift and that she was someone he could trust.  Id. at 147.  Then the government opined that they had a "relationship beyond just work" though there was no evidence whatsoever to support this far-flung theory.  Id.

The government then walked through the 2012 robbery stating "they" at each step, referring to Hurbace and Ms. Whitmore.  Id. at 148. They found Schroeder the only person there. They knew how to place the alarm on bypass. They knew how to take out the security systems. They know how  to rip out a DVD.  Id.  All of this before the government concedes that they don't need to actually be there to be liable because after all, that is what a conspiracy is all about.  Id. at 149.

The government went on to argue that "months" after the robbery, Ms. Whitmore deposited over $250,000 at Nevada State Bank and then she later moved it to her mother's account to disburse upon her death.  Id. at 150-151.

There are only two transactions between the 2012 event and the 2014 event alleged by the government and they are as follows:
- A deposit/CTR report made on 11/21/12 in the amount of $269,000.  Trial Tr. Day 3, page 81.
- A check written for $230,000 on 10/8/13.  Id., page 83.

With regard to the 2014 event, the government argued that Ms. Whitmore "found no additional work" after leaving 24/7 in the "third quarter of 2012," and she decided she would

THE LAW OFFICE OF KRISTINA WILDEVELD & ASSOCIATES
550 E. CHARLESTON BLVD.
LAS VEGAS, NEVADA 89104
PH: (702) 222-0007

steal again, this time with Mr. McDaniel.  Id. at 152.  They government suggested that they used the information Ms. Whitmore learned from the 2012 robbery to commit the 2014 burglary.  Id. at 153.  According to the Trustee, there was at least $10,000,000 there, though no one came forward to say they were missing anything, it was just logical to assume there were victims.  Id. at 154.

The government then argued that within six months of the 2014 burglary, Ms. Whitmore deposited $190,000 into her mother's account "to hide it," and that six months after that deposit she began withdrawing the money for various purposes.  Id.  All of this "other movement" the government describes, it attributes to the 2014 event, and these are the following transactions:

- An outgoing wire to Ticor Title on 3/26/15 in the amount of $90,637.87.  Id., page 89.
- A withdrawal on 5/28/15 in the amount of $133,962.54.  Id. at 89.
- A deposit to open an account at Wells Fargo in the amount of $133,962.54 on 6/1/15.  Id. at 94-95.
- A counter credit deposit for $190,000 on 8/4/14 (into a Trust account).  Id. at 97.  Suzette Whitmore's death was on 6/15/14.  Id. at 90.
- A withdrawal of $49,016.94 on 4/11/15.  Id. at 99.
- A purchase from Cadillac Las Vegas West in the amount of $49,016.94.  Id. at 100.  No date specified but corresponds to the 4/11/15 withdrawal.  Id.
- The 49,016.94 and the 133,000 withdrawals include at least some stolen funds.  Id at 103.

This is the government's "follow the money" argument, not Ms. Whitmore's.  The transactions listed above translate to the following Counts alleged against Ms. Whitmore:

| Count 6 | Money laundering of $269,000 on 11/21/12. |
|---|---|
| Count 7 | Money laundering of $230,000 on 10/8/13. |

These are the two transactions the government attributes to the 2012 event.

| Count 12 | Interstate transport of stolen property, Ticor Title Wire of $90,638 on 3/26/15. |
|---|---|
| Count 28 | Money Laundering, deposit of $190,000 on 8/14/14. |
| Count 29 | Money Laundering, withdrawal of $49,016.94 for vehicle purchase |

on 4/11/15.

Count 30    Money Laundering $90,638 the Ticor Title Wire transfer o

3/26/15.

Count 31    Money laundering, $133,963 withdrawal on 5/28/15.

Count 32    Money laundering, $133,963 deposit to open WF account on

6/1/15.

See verdicts, ECF 227.  This is the government's theory of which monies are attributed to which event.  Therefore, granting a motion for new trial, the 2014 event, necessitates a new trial on counts 12, 28, 29, 30, 31 and 32.

The jury instruction states that "For Counts Twenty-Eight to Thirty-Two, the specified unlawful activity can be **either** Interference with Commerce by Robbery (Hobbs Act Robbery) as described in Count Two **or** Fraudulent Transfer of Property as described in Count Eight. ECF 210 at page 30.  (**Emphasis in bold.**)  'Or' is defined as a 'disjunctive often with either or whether as a correlative, used to introduce a word or phrase expressing an object or action, the acceptance of which excludes all the other objects or actions mentioned'. Standard Dictionary, 1733." In re Mutchler, 95 B.R. 748, 756 (Bankr. D. Mont. 1989)       Thus, the reader is told to pick an event, but not both.  Since we do not know which event the juror selected as he predicate for counts 12 through 32, the court cannot determine whether a new trial is warranted on each of those counts or not, because there was no special verdict or selection required within the verdict forms.

"[A] verdict [must] be set aside in cases where the verdict is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected." Yates v. United States, 354 U.S. 298, 312, 77 S. Ct. 1064, 1 L. Ed. 2d 1356 (1957), *overruled on other grounds by* Burks v. United States, 437 U.S. 1, 98 S. Ct. 2141, 57 L. Ed. 2d 1 (1978); *see also* Stromberg v. California, 283 U.S. 359, 368, 51 S. Ct. 532, 75 L. Ed. 1117 (1931) ("[I]f any of the clauses in question is invalid under the Federal Constitution, the conviction cannot be upheld."); Skilling v. United States, 561 U.S. 358, 414, 130 S. Ct. 2896, 177 L. Ed. 2d 619

THE LAW OFFICE OF KRISTINA WILDEVELD & ASSOCIATES
550 E. CHARLESTON BLVD.
LAS VEGAS, NEVADA 89104
PH: (702) 222-0007

THE LAW OFFICE OF KRISTINA WILDEVELD & ASSOCIATES
550 E. CHARLESTON BLVD.
LAS VEGAS, NEVADA 89104
PH: (702) 222-0007

(2010) (explaining in a parenthetical that <u>Yates</u> stands for the proposition that "constitutional error occurs when a jury is instructed on alternative theories of guilt and returns a general verdict that may rest on a legally invalid theory").

In this case, the jury's determination may have been based on an invalid theory (count 8, subject to a new trial) or count 2, not otherwise previously addressed by Ms. Whitmore's counsel.  In the event that this Court does not agree that a new trial is warranted on all counts based on the newly discovered evidence, it is respectfully submitted that a new trial must be granted for Ms. Whitmore not only as to Count 8, but also as to Counts 12, 28, 29, 30, 31 and 32.

### XI.   <u>Conclusion</u>

For each of the reasons set forth herein, it is respectfully requested that the Court grant Ms. Whitmore and Mr. McDaniel a motion for new trial on all counts of conviction.  Rarely is there a case where a confession from a third party exculpates defendants on all counts with which the are charged. This is such a case. The Toda Raba letter, combined with the audio tape of Shaikin's conversation with Mr. McDaniel prior to the 2012 robbery are both newly discovered evidence that so undermine the verdicts that a new trial must be granted. Shaikin's confession is written by him, it contains as much indicia of reliability as the court could hope to see absent knowing who he handed it to after he wrote it.  While the undersigned will certainly continue to search for the author, it is not necessary to know who sent the letter to the court because the letter is corroborated not just by its content and all other circumstances possibly known to the court, but it is also corroborated by the recorded phone conversation where Shaikin, in retrospect, makes his intentions clear.  Shaikin was so upset about being forced out of his business in early 2014 that he and Hurbace conducted yet another burglary to loot the funds Shaikin had been self-looting for years. A new trial on all counts is warranted.  The task of this court, or any United States District Court, is to ensure that justice is served.  Justice would not be served by denying this Motion.

. . .

These defendants have also made an analysis of which counts should also garner a new trial should the court not find the Toda Raba letter and audio tape worthy of a new trial.

Respectfully submitted this 15th day of April 2022.

**The Law Offices of Kristina Wildeveld & Associates**

*/s/ Lisa A. Rasmussen*

LISA A. RASMUSSEN, ESQ.
Nevada Bar No. 7491
Attorneys for Sylviane Whitmore

**Hill Law Firm**

*/s/ Daniel J. Hill*

DANIEL J. HILL, ESQ.
Nevada Bar No. 12773
Attorneys for Larry McDaniel

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I served a copy of the foregoing JOINT MOTION FOR NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE, along with all of its Exhibits and Declarations, upon the following persons via CM/ECF on this 15th day of April 2022:

Mr. Tony Lopez, AUSA

Ms. Mina Chang, AUSA

Mr. Ozzie Fumo, Esq.

Ms. Kendall Stone, Esq.

Mr. Thomas Pitaro, Esq.

*/s/ Lisa A. Rasmussen*

LISA A. RASMUSSEN, ESQ.